NORSUL OIL & MINING COMPANY,
LTD., Plaintiff,

v.

TEXACO, INC., Texaco Petroleum Company, Chevron U.S.A. Inc., and Ecuadorian Gulf Oil Company, Defendants.

No. 76–1629–Civ.

United States District Court,
S.D. Florida.

Aug. 22, 1986.

Claude H. Tison, Jr., MacFarlane, Ferguson, Allison & Kelly, Tampa, Fla., for plaintiff.

James L. Armstrong, III, Smathers & Thompson, Miami, Fla., Milton Sherman, Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendants.

## MEMORANDUM OPINION ON PENDING MOTIONS AND ORDER SETTING STATUS CONFERENCE AND REQUIRING DEFENDANTS TO FILE DOCUMENTS

HOEVELER, District Judge.

THIS CAUSE is before the Court on defendants' motions for summary judgment and for partial summary judgment.[1]

In this action, a variety of claims are made by plaintiff, including the charge that defendants have wrongfully withheld royalty payments beginning with the last quarter of 1973. The withheld payments are said to be due pursuant to a private agreement entered into by subsidiaries in 1965. As will be developed below, this agreement has been affected by a series of agreements and transactions, both external and

---

1. *See* Docket Nos. 172, 173, 177 (defendants' motion for summary judgment with Exhibits 1–36); 210, 205 (defendants' replies); 195, 200, 228 (plaintiff's opposition); 229, 230, 232 (defendants' motion for partial summary judgment); 238 (defendants' reply); 235 (plaintiff's opposition);

185 (12/18/80 hearing transcript); 202 (1/29/81 hearing transcript);

174, 231 (Watkins affidavits), 175 (Lucas affidavit), 176, 206, 207 (Bustamante affidavits),

233 (Schwind affidavit), undocketed Schwind affidavit (11/23/83), 237 (Sherman affidavit), undocketed Sherman affidavit (11/18/85);

196 (Tison affidavit), 203 (Perez affidavit), 204 (Milne affidavit);

158, 159 (Gardner deposition and exhibits), 160 (Oxford deposition and exhibits), 161 (Tift deposition and exhibits), 193 (Forrest deposition and exhibits).

internal to the parties, which have reduced the scope of plaintiff Norsul's royalty payments.

Initially, I state the ruling of the Court. The motions based on the mixed theories of forum non conveniens and forum selection by contract are DENIED. The motions for summary judgment and partial summary judgment are also DENIED. The bases for these denials are set forth hereafter.

## I. BACKGROUND TO THIS ACTION

### A. THE PARTIES AND THEIR PREDECESSORS

Plaintiff NORSUL OIL & MINING CO., LTD. ("Norsul") is a corporation, incorporated in Canada, with its principal place of business previously at New York and presently at Albany, Georgia. Plaintiff was a principal shareholder in Minas at the time of the 1965 Private Agreement.

MINAS Y PETROLEOS DEL ECUADOR S.A. ("Minas") is a predecessor-in-interest to plaintiff Norsul. In 1961, Minas was a wholly-owned subsidiary of Norsul.

Defendant TEXACO, INC. ("Texaco") is a Delaware corporation, with its principal place of business in New York. It is qualified to, and does, do business in the state of Florida, from offices located in this district at 2121 Ponce de Leon Blvd., Coral Gables.

Defendant CHEVRON U.S.A., INC. was previously known to this litigation as GULF OIL CORP. ("Gulf"), a Pennsylvania corporation, with its principal place of business at Pittsburgh at one time and at San Francisco at a later time. It was authorized to, and did, do business in the state of Florida, from offices located in this district at 95 Merrick Way, Coral Gables.

Defendant TEXACO PETROLEUM COMPANY (also referred to herein as "Texaco Ecuador") is a wholly-owned subsidiary of defendant TEXACO. It is a Delaware corporation with its principal place of business in New York. It is not qualified to do business in Florida.

Defendant ECUADORIAN GULF OIL CORP. ("Gulf Ecuador") was a wholly-owned subsidiary of GULF OIL CORP. It was incorporated in Delaware, with its principal place of business at Pittsburgh. It was not qualified to do business in Florida. The record is unclear whether, at the present writing, Gulf Ecuador continues to do any business in Ecuador.

COMPANIA TEXACO DE PETROLEOS DEL ECUADOR C.A. ("Compania Texaco") was a subsidiary of defendant TEXACO in 1965.

GULF ECQUATORIANA DE PETROLEO S.A. ("Gulf Ecuador") was a subsidiary of defendant GULF in 1965.

PHOENIX CANADA OIL CO., LTD ("Phoenix"), is plaintiff in a related case, *Phoenix v. Texaco*, Case No. 76–0421 (D.Del.) (Schwartz, J.) ("*Phoenix*").

CORPORACION ESTATAL PETROLERA ECUATORIANA ("CEPE") is the state petroleum company of Ecuador.

### B. CHRONOLOGICAL BACKGROUND

The record before this Court yields the following chronological outline of events relevant to the claims in this lawsuit.

In 1961, Norsul obtained a concession by contract from the Ecuadorian Government (the "1961 Concession") for the exploration for and exploitation of petroleum. In 1963, Norsul acquired a 50/50 partner, Phoenix, to develop the 1961 Concession; for this development, Norsul and Phoenix formed Minas.

On March 5, 1964, Texaco Ecuador was granted a similar concession (the "Napo Concession") involving land adjacent to and directly north of Norsul's 1961 Concession. The Napo Concession was transferrable to Texaco Ecuador and Gulf Ecuador, and was so transferred on June 30, 1969.

In 1965/66, Minas, after negotiations, transferred to Texaco Ecuador and Gulf Ecuador the "Coca Concession," rights to develop a portion of the area included in the 1961 Concession. In return, Minas received rights to payments in the amount of 2% of the future production from the Coca Concession (the "2% Payments"). The total concession area held by defendants or their predecessors as a result of the Napo

Concession and the Coca Concession is referred to herein as the "Combined Concession."

### 1. *The 1965 Private Agreement*

Prior to 1965, Norsul had combined with Phoenix so that exploration and development of the 1961 Concession could be more feasible. That hope did not become a reality before 1965 and, as indicated, concession rights of both Norsul and Phoenix (held, at that time, by Minas) were the subject of a contract with Texaco/Gulf predecessors. Only Norsul seeks relief in this action. As noted above, Phoenix proceeds in federal district court in Delaware.

The directly relevant parties to the 1965 Private Agreement were:

    1.  Minas;

    2.  Compania Texaco de Petroleos del Ecuador C.A., predecessor-in-interest to defendant Texaco Ecuador; and

    3.  Gulf Ecquatoriana de Petroleo S.A., predecessor-in-interest to defendant Gulf Ecuador.

Defendants Texaco and Gulf were not signatories to the 1965 Private Agreement.

The 1965 Private Agreement is an agreement regarding the contemplated transfer of part of the 1961 Concession in exchange for two lump sum payments (one of $15,000 and one of $85,000) and future payments based on production from the transferred area. Under the terms of the 1965 Private Agreement, Texaco Ecuador and Gulf Ecuador would pay to Minas $15,000 and Minas would request the Ecuadorian Government to allow the transfer. Once the transfer was approved, Texaco Ecuador and Gulf Ecuador would pay Minas an additional $85,000. Once production began, the 2% Payments would begin. The Ecuadorian Government approved the transfer on December 20, 1965. Production began sometime between May 15, 1972 and August, 1972.

Attached as an exhibit to the 1965 Private Agreement was an unexecuted draft of the 1966 Deed of Transfer.

### 2. *1966 Deed of Transfer*

The relevant parties to the 1966 Deed of Transfer were:

    1.  Minas;

    2.  Russell Benson Wheeler, on behalf of Compania Pastaza, predecessor-in-interest to defendant Texaco Ecuador and successor-in-interest to Compania Texaco; and

    3.  Ricardo Crespo Zaldumbide, on behalf of Compania Aquarico, predecessor-in-interest to defendant Gulf Ecuador and successor-in-interest to Gulf Ecquatoriana.

Defendants Texaco and Gulf were not signatories to the 1966 Deed of Transfer.

The 1966 Deed of Transfer is the actual transfer of rights and liabilities under the 1961 Concession Contract. It refers to the $15,000 lump sum as the consideration for the transfer; it does not mention the $85,000 lump sum, the 2% Payments, or the 1965 Private Agreement.

The 1965 Private Agreement does not include any reference to a forum for the resolution of disputes. The 1966 Deed of Transfer provides, in this regard, in Clause 11, that "... all differences which may arise between the parties shall be discussed at a summary proceeding hearing before any of the Provincial Judges of Pichincha."

### C. CONTINUATION OF CHRONOLOGICAL BACKGROUND

After entering into the 1965 Private Agreement, Minas partners Norsul and Phoenix formed a second entity, Petromin S.A. Minas transferred its rights to the 2% Payments from the Coca Concession to Petromin S.A. and its remaining rights in the 1961 Concession to an oil consortium that is apparently unrelated to this action. Following that, Petromin S.A. assigned its rights in the Coca Concession 2% Payments to West Coast Petroleum Corporation, which subsequently assigned to Norsul and Phoenix, each, a 50% undivided interest in the 2% Payments.

In 1969, defendants struck a producing well, Shushufindi Well No. 1, at a location

within the Combined Concession. It is important to note here that a dispute arose (essentially among the parties here) as to whether the well was within the Napo or Coca Concession. If it was in Napo, defendants were not obligated under the 1965 Private Agreement. An action was commenced in New York to litigate the issue of location. It is my understanding from the record herein that defendants did not attempt renewal or dismissal of that action on the basis of a forum selection clause or for other reasons.

In 1970, a stipulation regarding the location of the Well was reached and resulted in the disposition of the federal lawsuit brought in the Southern District of New York involving, as suggested, at least some of the parties to this action. The stipulation provided that the Well was within the Coca Concession.

In 1971, Ecuador's new petroleum law (the "1971 Hydrocarbons Law") went into effect. Pursuant to that law, the Ecuador Government required that concessionaires under existing concession contracts enter into new agreements. The new agreement executed by Texaco Ecuador and Gulf Ecuador covered the entire area of the Combined Concession in a single agreement.

In 1972, production from the Coca Concession began, and 2% Payments came due for the first time. In 1973, Ecuador promulgated a new tax law (the "86% Tax") and again required a new exploitation agreement (the "1973 Exploitation Contract"), one provision of which extended to CEPE an Option to acquire a participation interest in the Combined Concession area (the "25% Option"). In 1974, CEPE exercised the 25% Option provided for in the 1973 Exploitation Contract.

In 1976, the results of an Ecuador Institute survey of the Combined Concession area indicated that Shushufindi Well No. 1 was not within the Coca Concession, but within the Napo Concession. As suggested above, Gulf Ecuador began negotiating for withdrawal from the Combined Concession and has now done so.

2. Docket No. 126 (Second Amended Complaint).

Plaintiff makes a variety of claims which will be discussed in detail hereafter. In preliminary sum, however, plaintiff suggests a course of action by the defendants which was not only violative of their contractual agreements but also was deceitful and in breach of fiduciary obligations imposed by law under the circumstances. The defendants are charged with wrongfully using a Texas high-sulphur oil, controlled price to determine the amount of 2% Payments due during several quarters; with failing to protect plaintiff's interest when the Ecuadorian Government's 25% Option was imposed; with failing, in any event, to reimburse plaintiff properly from payments received when the Government of Ecuador exercised the 25% Option; and, as to Gulf, with improperly divesting itself of its 37½% interest without protecting plaintiff and without paying plaintiff its rightful share of the funds received for the 37½%. As indicated, Phoenix, in a 1975 federal action brought in Delaware has presented substantially the same claims, against the same defendants; that action remains pending.

D. SUMMARY OF PLAINTIFF'S CLAIMS

Plaintiff's pending complaint[2] alleges the following:

1. Breaches of the 1965 Private Agreement, from Fourth Quarter 1973 to date, by:

a. Utilization of low unit value for crude oil production for the following Quarters (Count I):

(1) Fourth 1973;

(2) First 1974; and

(3) Second 1974;

b. Decrease of base production by 25%, from Third Quarter 1974 to date (Count II);

c. Decrease of base production by 37.5% from First Quarter 1977 to date (Count IV); and

d. Decrease of base production by production from Shushufindi Well No. 1, First Quarter 1976 to date (Count III).

2. Unjust enrichment, as an alternative to breach of contract claims 1.b and 1.c, above.

3. Breaches of fiduciary relationship, by the same actions above, for not protecting plaintiff's interest in the transfers to CEPE (Count V).

4. Punitive damages (Count VI).

Plaintiff alleges joint and several liability of all named defendants for claims 1.a, 1.b, 1.d, 2, 3, and 4, and joint and several liability of defendants Gulf and Gulf Ecuador for claim 1.c.

### E. ALLEGED DECREASES IN 2% PAYMENTS

No 2% Payments were due until after production began in mid–1972,[3] beginning with the Third Quarter 1972.[4]

On February 5, 1973, when 2% Payments for Third and Fourth Quarters 1972 were due and owing, Norsul, Compania Texaco and Gulf Ecuatoriana entered into an agreement (the "1973 Interim Agreement") for payments for those two quarters, as well as First Quarter 1973.[5] Plaintiff asserts that, in the 1973 Interim Agreement that resulted from discussions that took place in New York and Miami, the parties agreed that the 2% Payments for the two overdue quarters and the then-current quarter would be priced according to the official Ecuadorian price (the Ecuadorian tax reference price). Payments on this basis were made through the Third Quarter 1973. Thus, plaintiff makes no claims in this lawsuit regarding the sufficiency of 2% Payments for quarters prior to the Fourth Quarter 1973. However, plaintiff does contest the sufficiency of 2% Payments for all quarters beginning with and subsequent to Fourth Quarter 1973.

1. *Fourth Quarter 1973 through Second Quarter 1974 (Low Unit Value)*

For the 2% Payments due for the Fourth Quarter 1973 through Second Quarter 1974, plaintiff alleges that the terms of the 1965 Private Agreement governed,[6] but that defendants utilized a unit value for crude oil production that was smaller than that required by the 1965 Private Agreement, resulting in a calculation and payment of an amount that was less than that which plaintiff should have received.[7]

2. *First Quarter 1976 to Date (1970 Stipulation and 1976 Survey)*

Before production began and before the Combined Concession had been surveyed ("monumented"), defendants discovered oil that resulted in a producing well known as Shushufindi Well No. 1. Plaintiff and defendants disagreed on the location of the Well: whether within the Napo Concession or the Coca Concession.[8] To resolve the dispute, Norsul sued defendants Texaco and Gulf in the Southern District of New York in 1969, and the parties reached a stipulated settlement in April, 1970. Subsequent payments included in the base production from the Well.

In January, 1976, defendants announced the results of a survey of the Combined Concession area that indicated that the Well was approximately 390 feet outside the Coca Concession and within the Napo Concession.[9] The 1970 Stipulation was not modified. Payments beginning with those due for First Quarter 1976 have not included any amount for production from Shushufindi Well No. 1.[10]

3. *First Quarter 1977 to Date (Gulf Ecuador's Withdrawal)*

In the fall of 1976, Gulf Ecuador negotiated with the Ecuadorian Government for

---

**3.** Second Amended Complaint at ¶ 10. Various places in the record cite the beginning production date to be from May 15, 1972 to sometime in August, 1972.

**4.** Second Amended Complaint at ¶ 11.

**5.** Second Amended Complaint at ¶ 14.

**6.** Second Amended Complaint at ¶ 9.

**7.** Second Amended Complaint at ¶ 20.

**8.** Second Amended Complaint at ¶ 31 et al.

**9.** Second Amended Complaint at ¶ 34.

**10.** Second Amended Complaint at ¶ 36.

Gulf Ecuador's withdrawal from the Combined Concession. Since Gulf Ecuador's withdrawal, plaintiff has received no 2% Payments on an additional 37.5% of the production from the Coca Concession.

### 4. *Summary of Base Decreases*

The production base on which plaintiff's 2% Payments are calculated, has been decreased over the years, as follows:

| | |
|---|---|
| Original Base | 100.0% |
| (25% Option) | (25.0%) |
| (37.5% Gulf Withdrawal) | (37.5%) |
| Present Base | 37.5% |

In addition, plaintiff's present base does not include any production from Shushufindi Well No. 1.

## II. CHOICE OF FORUM ISSUE

After extensive review of the documents and pleadings filed with regard to the pending motions and after hearing the parties on these motions on several occasions, the Court has determined, as a preliminary matter, that the parties have not presented a choice of forum agreement that compels dismissal of the action from this Court.

In *The Bremen v. Zapata*, 407 U.S. 1, 10, 92 S.Ct. 1907, 1913, 32 L.Ed.2d 513 (1972), the United States Supreme Court held that choice of forum clauses "are prima facie valid and should be enforced unless enforcement is show by the resisting party to be 'unreasonable' under the circumstances." The parties to this action do not dis-

pute the *validity* of the choice of forum clause discussed herein; rather, they dispute its scope and application.

### A. LAW OF THE CASE ARGUMENT

The Court's attention to the choice of forum clause in the 1966 Deed of Transfer[11] was first invited in defendants' motion to dismiss the complaint in 1976.[12] That motion was summarily denied on June 17, 1977.[13]

In its opposition to the presently pending motions, plaintiff contends that the issue of the applicability of the choice of forum clause was determined on the merits in the Court's consideration of the earlier motion to dismiss.

The Court finds that the defendants' urging in the earlier motion to dismiss was that this case should be dismissed on the ground of *forum non conveniens* and that attention was drawn to the choice of forum clause for purposes of buttressing their *forum non conveniens* argument, not for the purpose of urging that the clause itself compelled dismissal. Thus, the denial of defendants' prior motion to dismiss was not a complete adjudication of the applicability of the choice of forum clause.[14] In any event, the Court notes that the nature of the denial was essentially without prejudice and does not, therefore, preclude reconsideration of the present motion for summary judgment as it applies to that point.[15]

### B. EXCLUSIVITY OF THE CHOICE OF FORUM CLAUSE

As noted above, the Supreme Court has held that choice of forum clauses must be

---

**11.** Docket No. 172 Exhibit 4.

**12.** This motion was supplemented April 6, 1977, with related exhibits and affidavits. *See* Docket Nos. 8, 21, 22, 23 and 24.

**13.** *See* Docket Nos. 33, 56.

**14.** Transcript of a January 29, 1981, hearing on the present motion for summary judgment (Docket No. 202) provides at page 17:

I believe that it at least is a genuine material issue of fact as to the choice of forum. And even if that is not so, I think the circumstances surrounding this action suggests that if I

were to grant dismissal of the entire complaint, it certainly would not be on that basis. So, you might wish to shorten your argument with reference to that argument, with reference to that item.

*But see* Defendants' Reply Memorandum in Support of Motion for Summary Judgment at 2 n. 2 (Docket No. 205). In a Reply Memorandum filed after the January 29, 1981, hearing on this motion, the defendants stated:

In view of the Court's rejection of this branch of defendants' motion at the January 29 argument, defendants will present no additional argument as to choice of forum.

**15.** *But see* text at n. 30, *infra*.

enforced "specifically." In *Citro Florida Inc. v. Citrovale, S.A.*, 760 F.2d 1231 (11th Cir.1985), a panel majority of the Eleventh Circuit, reviewing a Florida district court case, held that the words "place of jurisdiction is Sao Paulo/Brazil" appearing in a telex and not objected to by the receiving party constituted a nonexclusive choice of forum clause and, therefore, did not compel dismissal of an action in which the clause was in issue.

An examination of the clause in question here the parties to it and the succession of "agreements" which preceded and followed the clause in the 1966 "Deed," is indicated.

On the issue of exclusivity, this Court has compared the choice of forum clause in *The Bremen* ("any dispute must be treated") and that in *Citro Florida* ("place of jurisdiction is Sao Paulo/Brazil") with the choice of forum clause alleged to be controlling in this action ("all differences ... shall be discussed" in Ecuador). Under the circumstances presented in this case, the Court finds that the choice of forum clause is substantially similar to that in *The Bremen* and that it probably was meant to be "exclusive," as that term is used by the panel majority in *Citro Florida*, and insofar as the "Deed" was concerned. However, the scope of the clause is not sufficiently broad to encompass the present action. Note, of interest, the case of *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970).

## C. SCOPE OF THE CHOICE OF FORUM CLAUSE

### 1. *Effect of Choice of Law Rules*

This case is before the Court by virtue of its diversity jurisdiction. In diversity cases, federal courts apply the choice of law rules of the forum. For this district, that forum is Florida. Under Florida's choice of law rules, the nature, validity and

interpretation of contracts are to be governed by the substantive law of the country or state where the contracts are made or are to be performed. *Goodman v. Olsen*, 305 So.2d 753 (Fla.1974), *on remand*, 307 So.2d 842 (Fla.App.), *cert. denied*, 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975), *appeal after remand*, 365 So.2d 393 (Fla. App.1978).

Even if Ecuadorian law, by operation of the Florida choice of law rules, determines the validity and effect of the 1965 Private Agreement and the 1966 Deed of Transfer, interpretation of the scope of a choice of forum clause in an agreement giving rise to claims asserted in this Court is a matter not of Ecuadorian law, but of United States law binding in this forum.

### a. *The 1965 Private Agreement*

Plaintiff alleges that its claims initially rise under a 1965 Private Agreement.[16]

Under the terms of the 1961 Concession Contract[17] (the agreement between plaintiff's predecessors and the Ecuadorian Government), the Government of Ecuador's approval was necessary to the validity of any transfer.[18] The parties do not dispute the fact that the 1966 Deed of Transfer was actually approved by the Government and executed. The parties agree that Paragraph 42 of the 1961 Concession Contract is a choice of forum clause with regard to disagreements arising among concessionaires and between the Government of Ecuador and plaintiff's predecessor.[19] It is of interest that neither the 1961 Concession Contract nor the 1965 Government resolution approving the transfer[20] specifically prescribes a forum for the resolution of disputes between a concessionaire and its transferee, based on a private agreement between them.[21]

The Eleventh Clause of the 1965 Private Agreement anticipates the possibility of the

---

**16.** Docket No. 172 Ex. 2.

**17.** Docket No. 172 Ex. 1.

**18.** *See* 1966 Deed of Transfer (Docket No. 172 Ex. 4).

**19.** *See* Docket No. 172 Ex. 1.

**20.** Docket No. 172 Ex. 3.

**21.** Indeed, it is not clear, on the present record, whether the Ecuadorian Government was aware of any consideration for the transfer other than that set forth in the Deed of Transfer. Nor is it clear when the Ecuadorian Government became aware of the 1965 Private Agreement.

Government's nonapproval of the agreed upon transfer:

> ELEVENTH.—If the Government, within a period of one year, counted from the date of execution of this instrument, does not approve the project [the draft of the 1966 Deed of Transfer], or does not approve it under the terms that [the predecessors of the Ecuadorian defendants], at their own judgment, deem satisfactory, this instrument shall be considered as terminated and neither of the two parties may claim from other anything or any indemnification as a consequence of the present private contract, the request to the Government [to allow the transfer], the project, or of any of the events or acts related to or derived from all such instruments.

The Court further notes that Clause Third (a) of the 1965 Private Agreement provides that the parties have agreed to the terms of the draft of the 1966 Deed of Transfer, which was attached to the 1965 Private Agreement as an exhibit and includes the choice of forum clause.

### b. *The 1966 Deed of Transfer*

The 1966 Deed of Transfer was made in Ecuador, executed by Ecuadorian parties, and transferred rights and obligations with respect to the exploration for and exploitation of oil reserves within the territorial boundaries of Ecuador. The 1966 Deed of Transfer contains a number of provisions to which "[t]he parties agree" and is executed by the predecessors in interest of both the plaintiff and the defendants in this action.

Clauses Four and Nine of the Deed of Transfer refer to $15,000 as consideration for the transfer. There is no mention, in the 1966 Deed of Transfer, of the additional payments (*i.e.*, the $85,000 and the 2% Payment of net production) contemplated in the 1965 Private Agreement.

Clause Eleven of the 1966 Deed of Transfer provides:

---

22. Docket No. 176 at 3 (Bustamante Affidavit).

23. *See* Clause First (g) of the 1965 Private Agreement; Clause First (e) of the 1966 Deed of Transfer.

The parties agree that from the date of registration, all differences which may arise between them shall be discussed at a summary proceeding hearing before any of the Provincial Judges of Pichincha.

The parties agree that Clause Eleven of the 1966 Deed of Transfer is a choice of forum clause. They disagree whether its scope is broad enough to encompass all the claims made by plaintiff in this lawsuit. As to the present motion for summary judgment, plaintiff contends that Clause Eleven does not govern any rights for which it sues under the 1965 Private Agreement. Defendants contend that the reference in Clause Eleven to "all differences" is not limited to differences with respect to the 1966 Deed of Transfer, but also includes differences with respect to rights and obligations set forth in the 1965 Private Agreement. The parties have submitted expert testimony, in the form of affidavits, regarding this issue's resolution under Ecuadorian law.

### 2. *Defendants' Expert Testimony*
#### a. *Roque Bustamante Cardenas.*

One of defendants' experts is Roque Bustamante Cardenas. Mr. Bustamante concludes that the 1965 Private Agreement and the 1966 Deed of Transfer bind the parties in this cause to an agreement, expressed in those documents, to submit to the law of Ecuador for interpretation of those documents and to Ecuador as the forum in which disputes among them must be adjudicated or otherwise resolved.[22]

Mr. Bustamante reasons as follows: The parties to the 1965 Private Agreement and to the 1966 Deed of Transfer agreed that they were "subject to Ecuadorian laws."[23] In addition, they agreed that they were subject "to the jurisdiction of judges and tribunals of [Ecuador]."[24] Further, they expressed their intent "to act in all cases in

---

24. *See* Clause First (g) of the 1965 Private Agreement; Clause First (e) of the 1966 Deed of Transfer.

accordance with the Ecuadorian laws, decrees, regulations, etc., in effect." [25] Finally, Mr. Bustamante reasons that, because the 1966 Deed of Transfer was an integral part of the contractual relationship between the parties, the choice of forum clause in the 1966 Deed of Transfer applies also to disputes regarding rights and obligations arising under the 1965 Private Agreement.

### b. *Michael A. Schwind.*

Defendants' expert, Michael A. Schwind, opines that "[t]he 1965 Agreement would be considered under Ecuadorian law to be a promise by the parties thereto to execute the Notarial Instrument [the 1966 Deed of Transfer], subject to the conditions stated in the 1965 agreement...." [26]

### 3. *Plaintiff's Expert Testimony*
### a. *Jose Maria Perez-Arteta.*

Plaintiff's expert is Jose Maria Perez-Arteta. Mr. Perez's opinion does not respond to Mr. Bustamante's explication of the effect of the language in the 1965 Private Agreement and the 1966 Deed of Transfer with regard to the choice of forum and choice of law discussion noted above. Instead, Mr. Perez's opinion discusses the effect of Ecuadorian governmental actions subsequent to the execution of those documents, on the rights and obligations arising under those documents.[27]

### b. *Claude H. Tison, Jr.*

Plaintiff also submitted the affidavit of its attorney in this lawsuit, Claude H. Tison, Jr.[28] In that affidavit, Mr. Tison represents that Mr. Perez has indicated disagreement with Mr. Bustamante's conclusion regarding the choice of forum and choice of law clauses.[29]

### 4. *Evaluation of Expert Testimony*

On the matter of choice of law, the Court would agree that, in both the 1965 Private Agreement and the 1966 Deed of Transfer, the parties thereto observed that certain actions taken by the Ecuadorian Government could affect them and they agreed to recognize such effects.

On the matter of choice of forum, the Court finds that Mr. Bustamante's testimony concerns the results that Ecuadorian courts would have reached (1) if the parties had included a choice of forum clause specifying a forum other than Ecuador, or (2) if the plaintiff had brought this action in Ecuador rather than here. Neither of these circumstances is present in this case. As to the effect of the absence of any choice of forum clause in such a contract in an action brought in a forum other than Ecuador, his view is not compelling.

Neither is it compelling concerning the effect of the inclusion of a choice of forum clause in one document that does not refer to another document between the same parties. Determination of the *scope* of a choice of forum clause is one to be made according to the applicable local law of the forum, although I believe it is not improper to consider the interpretation that another interested forum would give to the clause. Such *information is not*, however, binding but rather only instructive on the issue of scope. The law governing interpretation of choice of forum clauses binding on this Court and expressed in *The Bremen* and *Florida Citrus* requires *specific* enforcement and suggests strict interpretation of choice of forum clauses so that a federal court otherwise having jurisdiction to hear a dispute is not ousted of its jurisdiction. The evidence in the record of this case simply does not support a finding that the parties intended that disputes arising under provisions found only in the 1965 Private Agreement necessarily be adjudicated in Ecuador. The burden of proof in this motion for summary judgment is on the movant. With respect to the scope of the choice of forum clause, this Court finds that defendants have failed to carry that burden.

---

**25.** *See* Clause Ninth (b) of the 1965 Private Agreement.

**26.** Schwind Affidavit at ¶ 52 (November 23, 1983).

**27.** *See* Docket No. 203 (Perez Affidavit).

**28.** *See* Docket No. 196 (Tison Affidavit).

**29.** Docket No. 196 at 3–4 (Tison Affidavit).

## D. OTHER CONSIDERATIONS

Several additional considerations are important and reinforce the conclusions stated. Of interest is the record fact that the choice of forum position is not presented in defendants' Answer to plaintiff's Second Amended Complaint to which this motion for summary judgment was subsequently addressed more than a year after the Answer was filed.[30]

Second, there is at least some suggestion in the record that Ecuador would refuse to hear this case, to the extent that it is between parties "alien" to Ecuador.[31] As to Ecuador, the record suggests that both plaintiff and defendants Texaco and Chevron are aliens.

Thirdly, the present record suggests that neither Texaco nor Gulf was party to either the 1965 Private Agreement or the 1966 Deed of Transfer. While it is also a record fact that their predecessors in interest were parties to such agreements, the series of events taking place thereafter would suggest some questions in the minds of defendants as to the applicability of the "selection" clause to the ensuing differences, of record and otherwise. For example, the dispute over the location of Shushufindi Well No. 1 was settled in an action brought in New York. Negotiations for the 1973 Interim Agreement were in New York and Miami. It was argued at hearing that the truly financially responsible parties (Texaco and Gulf) are U.S. corporations, each with offices in the Southern District of Florida.

Assuming Ecuadorian law, in part or completely, governs, these matters can be determined here. We have North American parties essentially arguing about contract rights and the accounting of monies which were to be paid in the United States. Further, this matter has been pending in this district for an extended period. Plaintiff selected the forum and the matter of forum choice was not directly pressed until a lengthy period had expired after suit had been filed. I should note further that the similar *forum non conveniens* position taken by defendants in the Delaware suit (*Phoenix*) was rejected by that court. Additionally, the record indicates that a number of the persons and documents involved in the corporate relationships which will be developed in this action are at present, or were at relevant times, in this district or in the United States.

Lastly, even though the Court's review of the record in this case to date suggests that a number of key documents were originally written in Spanish, the record also reveals that translations of these documents into English exist and that the translations proffered have not been disputed. The record also suggests that most, if not all, of these translations were made either contemporaneously with the promulgation of the originals, or perhaps shortly thereafter. Finally, the record contains a number of documents originally in English that relate to these proceedings.

## E. CONCLUSION

A consideration of the evidence offered and the arguments presented persuades me to the conclusion that the choice of forum clause appearing in the Deed of Transfer is not applicable to the claims asserted in this lawsuit. Even if the clause were applicable, I would exercise discretion to refuse enforcement because of the significant equitable considerations applicable.

Consistent with the foregoing, this action shall not be dismissed from this Court on the basis of the choice of forum clause appearing in the 1966 Deed of Transfer. The defendants' motion, in this regard, is DENIED.

## III. UNJUST ENRICHMENT ISSUE

██ Plaintiff alleges that, if it loses on its breach of contract claim with regard to the 2% Payment on that portion of production now held by CEPE (*i.e.*, 62.5%), it is,

---

**30.** Defendants' Answer to the Second Amended Complaint was filed August 3, 1979 (Docket No. 127). The present motion for summary judgment was filed more than a year later, on December 10, 1980 (Docket No. 172).

**31.** Docket No. 29 at ¶ 15.a (Fowler Affidavit).

nevertheless, under a theory of unjust enrichment, entitled to a portion of (1) the amount paid by CEPE in 1974 pursuant to its exercise of the 25% Option anticipated by the 1973 Exploitation Contract and (2) the amount paid by CEPE in 1977 (for 37.5%) pursuant to its agreement for defendant Gulf Ecuador's withdrawal, because those amounts necessarily included compensation for future production rights.

Defendants have moved for summary judgment on this claim, contending that:

(1) no part of the payments made by the Ecuadorian Government was made in return for rights to future production; and alternatively, even if it was,

(2)(a) the applicable substantive law to be applied to plaintiff's unjust enrichment claim is Ecuadorian local law;

(b) Ecuador recognizes no cause of action for unjust enrichment; and

(c) even if Ecuador recognized a cause of action for unjust enrichment, as plaintiff alleges, plaintiff cannot prove the elements of such a cause of action.

## A. CHOICE OF LAW

I agree with the conclusion of the Delaware district judge in the companion case, *Phoenix,* that the law of Ecuador determines whether plaintiff has a cause of action for unjust enrichment in connection with the payments made by CEPE pursuant to the 25% Option and the Gulf Withdrawal.

## B. WHETHER ECUADOR HAS A CAUSE OF ACTION FOR UNJUST ENRICHMENT

On these motions for summary judgment, the burden of proof is on defendants to show that Ecuador does *not* have a cause of action for unjust enrichment. Defendants have failed to meet that burden and, for that reason, defendants' motions are DENIED on this issue. Moreover, I am persuaded, after reviewing the relevant documents of record in this case, that Ecuador would recognize a cause of action for

unjust enrichment. I will expect the parties, in pretrial memoranda, to further develop the extent to which, under Ecuadorian law, a party must present evidence to support such a claim; that is, the necessary elements giving rise to such a claim and the applicability of the facts herein to such law.

## C. NATURE OF THE PAYMENTS

In 1971, the Ecuadorian Government issued Decree No. 1459,[32] the 1971 Hydrocarbons Law, and in June 1972, it issued an amendment (the "1972 Amendment") which dealt with the current effect of concession contracts entered into prior to the passage of the 1971 Hydrocarbons Law.[33] In part, the 1971 Hydrocarbons Law provided that the Government would attempt to transform concession contracts into association contracts.

In the August, 1973 Exploitation Contract, clause 52.1 provided for CEPE's future participation in the exploitation efforts of Texaco Ecuador and Gulf Ecuador.

CLAUSE 52—OPTION OF CEPE'S PARTICIPATION

52.1 CEPE may acquire up to 25 percent of the rights and actions conferred in this contract and in the assets acquired by the contractors for purposes of this agreement, after a prior payment of the duties, assets and obligations corresponding in accordance with terms and conditions to be determined by the parties. Should CEPE resolve to exercise this right, it shall so notify within 90 days prior to June 6, 1977.[34]

In January, 1974, the Ecuadorian Government decided to move up the date of CEPE's participation from 1977 to "within the year," in order "to harmonize the development of its petroleum industry with the resolutions" of OPEC and "to make effective reasonable governmental participation in the property of those companies titleholders under any kind of contract." [35] Negotiations resulted in the "Acta" of June

---

**32.** Docket No. 196 Ex. 9.

**33.** Docket No. 172 Ex. 17.

**34.** Docket No. 8 Ex. 23; Docket No. 172 Ex. 19.

**35.** Docket No. 8 Ex. 29; Docket No. 172 Ex. 20.

14, 1974 for the "purchase and sell [sic]" of assets, effective June 6, 1974.[36]

The effect of the 1974 exercise of the option was to allow the Ecuadorian Government's direct participation, through CEPE, in an ongoing exploitation endeavor. At the time CEPE began participating, Texaco Ecuador and Gulf Ecuador had already invested a certain amount of capital for machinery, tools, etc. Some of these assets were amortizable under Ecuadorian law, at Ecuadorian amortization rates.[37] The record suggests that, from the point in time at which CEPE became a direct participant, CEPE was proportionally responsible for future investment needs in the exploitation area.

In 1976, when Gulf wanted to withdraw, CEPE agreed to pay an amount, calculated on the same basis, for Gulf's proportionate share of the unamortized value of the assets in question.

Plaintiff argues that, when a party in the position of defendants withdraws from exploitation in Ecuador, any assets used in the exploitation must be left behind, at no cost to the Ecuadorian Government, for the benefit of the Ecuadorian Government, and in good working order. Therefore, plaintiff posits, these assets had no real value to defendants for which they could be compensated, and it cannot be true that no portion of the amounts paid by CEPE in 1974 and 1977 was related to future production rights. In short, plaintiff contends that payments by CEPE for the 25% and the 37.5% interests included payments for the recovery of future production rights previously granted by the Government in the 1973 Exploitation Contract.

In reviewing the relevant documents of record in this case, the Court has considered particularly the transcript of the hearing held on January 29, 1981, in which the parties addressed this issue extensively in oral argument.[38] I conclude that defendants have failed to carry the burden of proof necessary to sustain their motions for summary judgment on this issue and, therefore, the motions are DENIED on this issue.

## IV. BREACH OF CONTRACT ISSUE

Defendant has moved for summary judgment on plaintiff's breach of contract claim, set forth in Count I of the pending complaint. At the heart of this claim is the interpretation of a certain ministerial decree, Decree No. 11927, and its impact on the rights of the parties.

### A. BACKGROUND

#### 1. *1961 Concession Contract*

The record indicates that the 1961 Concession Contract was entered into under Ecuador's 1937 Petroleum Law. The record does not indicate that the 1961 Concession Contract was affected, in any way, by the later 1961 Petroleum Law.[39] Clause Twenty-Sixth of the 1961 Concession Contract tied the valuation of oil, for purposes of paying the required Government royalty, to the price at a Texas oil field.[40]

#### 2. *1965 Private Agreement*

Clause Sixth of the 1965 Private Agreement provided for the 2% Payment and how it was to be computed. Clause Sixth (b) "defined [value] for the purpose of calculating the payment of the royalties which cessionaires must make to the Government...."[41]

Clause Eighth (a) provided that, if the parties had a problem with Clause Sixth, they agreed to abide by "volumes and

---

**36.** Docket No. 172 Ex. 24.

**37.** Defendants suggest that the tangible assets were amortizable over a longer period of time under Ecuadorian law than under U.S. law and that this difference in amortization rates accounts for the "profit" indicated in internal Gulf documents regarding operations in Ecuador.

**38.** Docket No. 202.

**39.** The 1961 Petroleum Law itself does provide that "any other laws or decrees on oil and hydrocarbons which conflict with the present Law are hereby abolished." Docket No. 196 Ex. 8 at 18.

**40.** Docket No. 172 Ex. 1 at 23.

**41.** Docket No. 172 Ex. 2 at 9–10.

prices [estimated] in the relations between the cessionaires and the Government...." [42]

In Clause Ninth (b), the parties agreed to abide by Ecuadorian regulations regarding payments.[43]

### 3. *1971 Hydrocarbons Law*

On September 28, 1971, President Ibarra issued Decree No. 1459, a new hydrocarbons law for Ecuador ("1971 Hydrocarbons Law"), which went into effect on October 1, 1971.[44] A "Fundamental Provision" of the 1971 Hydrocarbons Law is found in Article 2:

> The State shall explore and exploit the [deposits of hydrocarbons and accompanying substances] ... in a direct manner through [CEPE], which will do so by itself or by executing association contracts, or service contracts with national or foreign companies, or by establishing mixed economy companies.[45]

The 1971 Hydrocarbons Law also specifically repealed the 1961 Petroleum Law and "all provisions opposed to this Special Law...."[46]

By Decree No. 430 (the "1972 Amendment"),[47] issued June 6, 1972, the Ecuadorian Government amended the 1971 Hydrocarbons Law to regulate concession or association contracts entered into before the enactment of the 1971 Hydrocarbons Law in view of the new law.[48]

Article Fifth of the 1972 Amendment provided that contracts previously entered into "may retain their original legal form, subject to the provisions of this Law, except what is provided in clause eleven of the additional and complementary contract of Decree 1321 [sic] of June 26, 1969." [49]

Clause Sixth provided that, for "the full implementation of" Clause Fifth, the concessionaires "shall sign new contracts, within a year counted from the enactment of this Law, of a single type, and which shall be similar for all." [50]

### 4. *Private Negotiations*

The record indicates that, at least as early as February 4, 1971, Norsul and Phoenix were concerned with the interpretation to be given to the "royalty terms" (*i.e.*, the 2% Payment) in the 1965 Private Agreement.[51] On October 12, 1971, Norsul executives telephoned Texaco counsel to initiate negotiations regarding the "royalty (production payment)" provided for in the 1965 Private Agreement.[52] The parties met in New York on Tuesday, November 9, 1971, at Texaco offices.[53]

During 1972, Norsul worked on accumulating and documenting the chain of transfers from Minas to Norsul.[54] A meeting planned for Tuesday, March 28, 1972 in Ecuador, between Norsul's Gardner and Gulf's Crespo, did not occur because the Quito airport was closed that morning.[55] Later that year, on June 6, 1972, the [new

---

**42.** Docket No. 172 Ex. 2 at 11–12.

**43.** Docket No. 172 Ex. 2 at 14.

**44.** Docket No. 196 Ex. 9.

**45.** Docket No. 196 Ex. 9 at 1.

**46.** Docket No. 196 Ex. 9 at 27.

**47.** The 1971 Hydrocarbons Law contains a concluding section entitled "Transitory Provisions." The translated text of Decree No. 430 indicates that "(these are 'Transitory Provisions' being added to the Hydrocarbons Law of October 1, 1971)." To avoid confusion, Decree No. 430 is referred to herein as "the 1972 Amendment."

**48.** Docket No. 172 Ex. 17.

**49.** Docket No. 172 Ex. 17 at 2. Clause 11 refers to cartography; "Decree 1321" should read Decree 1324. *See* Docket No. 8 Ex. 13, 14.

**50.** Docket No. 172 Ex. 17 at 2.

**51.** Gardner Deposition Ex. 50.

**52.** Gardner Deposition Ex. 7.

**53.** Gardner Deposition Ex. 9; *see also* Gardner Deposition Exhibit 10; Gardner Deposition Ex. 11.

**54.** *See, e.g.*, Gardner Deposition Exs. 42, 12, 35, 32, 34, 36, 30; Tift Deposition Exhibit 12; Gardner Deposition Exs. 29, 41, 37, 4, 38, 39, 40; Oxford Deposition Exhibit 3; Gardner Deposition Ex. 49.

**55.** Gardner Deposition Ex. 12 at 9.

Revolutionary] Government of Ecuador issued Supreme Decree No. 430, amending the 1971 Hydrocarbons Law.[56] The next year, on February 3, 1973, Norsul, Phoenix, Texaco Ecuador and Gulf Ecuador entered into an agreement ("1973 Interim Agreement") regarding the 2% Payment for all quarters up to and including First Quarter 1973,[57] and agreeing to negotiate regarding 2% Payments on production in subsequent quarters.[58] Later, this Interim Agreement was extended to cover payments for the Second and Third Quarters 1973.

In the 1973 Interim Agreement, the parties agreed to use the Ecuadorian Tax Reference Value ("TRV") for purposes of calculating the 2% Payment for the quarters covered by that agreement.

### 5. *Events of February-March, 1973: Suspension of Payments*

On February 22, 1973, Minister of Energy and Natural Resources Jarrin wrote to Minister of Finance Salas, advising that the 2% Payment has "no legal basis whatsoever" and requesting Minister Salas "to take the appropriate measures to recover the revenues due the Nation and to study the means for issuing a Special Decree, which would leave without effect the percentages illegally agreed upon...." [59]

On February 23, Minister Jarrin transmitted a copy of his February 22 communication to Texaco Ecuador and Gulf Ecuador, "for the purpose of suspending any payments relating to the mentioned obligations, until the Government decides what is advisable regarding this particular case." [60]

On February 27, Director General of Hydrocarbons Bixby advised Minas of Minister Jarrin's February 28 declaration of the forfeiture of the 1961 Concession Contract

and its 1971 Amendment, referring to "the termination of all the rights contained in those contracts or derived therefrom...." [61]

On March 1, Texaco's Shields wrote to Gulf's Palmer, noting that, pursuant to the 1972 Amendment of the 1971 Hydrocarbons Law, discussions regarding a new concession contract had begun within the previous two weeks.[62]

On March 15, Director General of Internal Revenue Sviercovich advised Texaco Petroleum Company to "withhold ... all the monies which Texaco Petroleum Company is obliged to pay [Minas and Strouth]." [63]

On March 22, Sviercovich advised that his March 15 prohibition extended "to the natural or juridical persons which may have obtained rights to such payments by assignment or by purchase." [64]

### 6. *May 1973: The Retroactive 86% Tax*

On May 24, Texaco Ecuador transmitted to Norsul and Phoenix statements regarding production from the Coca Concession and noted that:

As you have been previously advised, all payments under the February 5, 1973 Agreement [i.e., the 1973 Interim Agreement] are being suspended pending further instructions from the Ecuadorian Government. You understand, of course, that the net amount payable to your companies will be determined by Ecuadorian laws in effect at the time that payment is made.[65]

On May 29, President Lara issued Decree No. 602, amending the Income Tax Law to provide for an 86% tax on "[a]ll income generated by premiums, percentages or other kinds of participations established for

---

56. Docket No. 8 Ex. 14; Docket No. 172 Ex. 17.

57. The First through Fourth quarters are calculated on a calendar year and end, respectively, 3/31, 6/30, 9/30, and 12/31 annually.

58. Docket No. 8 Ex. 15.

59. Docket No. 8 Ex. 18.

60. Docket No. 8 Ex. 17.

61. Docket No. 8 Ex. 19.

62. Docket No. 196 Ex. 4.

63. Docket No. 8 Ex. 20; *see also* Tift Deposition Ex. 14.

64. Docket No. 8 Ex. 21.

65. Docket No. 29 Ex. 8.

assignments or transfers of mining or hydrocarbon concessions;" making assignees (*i.e.*, defendants) agents for its collection; requiring it to be deposited in the Central Bank of Ecuador; and making it retroactive to "the date on which the assignees have initiated ... production."[66]

### 7. *1973 Exploitation Contract*

Pursuant to the 1972 Amendment, on August 16, 1973, President Lara issued Decree No. 925, "completely substituting" a new contract ("1973 Exploitation Contract") for that of 1961, 1964 and 1969, under which the Ecuadorian subsidiary defendants in this action had been operating.[67]

### 8. *CEPE's Exercise of 25% Option*

On January 2, 1974, President Lara issued Supreme Decree No. 09, directing Minister Jarrin to negotiate for exercise of the 25% Option within the year.[68]

On May 27, 1974, Gulf's Barrett in Quito telexed Gulf in Coral Gables regarding recent "participation negotiation," noting that the Government would not consider CEPE's assumption of a pro rata share of the 2% Payment and that further insistence could precipitate the deposit of 100% of the 2% Payment, calculated on the TRV, with possible retroactive application.[69]

On June 14, 1974, CEPE, Minister Jarrin, Texaco Ecuador and Gulf Ecuador executed an agreement providing for CEPE's participation, beginning at 00:01 hours June 6, 1974.[70]

### 9. *Decree 11927 (July 30, 1973—April, 1975)*

On July 30, 1973, Norsul's Fowler wrote to Norsul's attorneys in Quito, Andres and Manuel Cordova,[71] noting that he planned to be in Ecuador in two to three weeks and planned to approach Minister Jarrin once Texaco and Gulf had signed new contracts.[72] On October 30, 1973, Moore of Phoenix, wrote to Norsul's Fowler regarding a meeting he had had with Manuel Cordova and noted that the "Fomento action on our behalf is stalled a few days."[73]

Sometime after that date[74] and before March 20, 1974, the Banco Nacional de Fomento (the "Bank") addressed a submission to Minister Jarrin, complaining of (1) the suspension of the 2% Payments and the tax due thereon, and (2) the deductions made by Texaco Ecuador and Gulf Ecuador in calculating the payment of the 86% tax; and requesting a "resolution, specifying in a clear and precise way how the taxes in favor of [the Bank] should be paid in accordance with the law and the agreements actually in full force."[75]

Meanwhile, on January 16, 1974, Norsul's Forrest wrote to Norsul's Fowler regarding the contract with Texaco and Gulf and its "intent" then and now.[76] On February 7–8, the parties met in Coral Gables to negotiate an agreement.[77] A proposed amendment of agreement among Texaco, Gulf, Norsul and Phoenix appears in the record and appears to be dated on or about February 27, 1974.[78]

---

**66.** Docket No. 8 Ex. 22; Docket No. 172 Ex. 18; *see also Phoenix v. Texaco Inc.*, 560 F.Supp. 1372, 1376 (D.Del.1983).

**67.** Docket No. 8 Ex. 23; Docket No. 172 Ex. 19; *see also Phoenix*, 560 F.Supp. at 1376.

**68.** Docket No. 8 Ex. 29; Docket No. 172 Ex. 20.

**69.** Docket No. 196 Ex. 5.

**70.** Docket No. 172 Ex. 24.

**71.** The record indicates that the Cordovas were Ecuadorian counsel for both Norsul and Phoenix at this time. *See* Fowler Deposition Ex. 19.

**72.** Fowler Deposition Ex. 21.

**73.** Fowler Deposition Ex. 17.

**74.** The record indicates that On November 9, 1973, Moore spoke to Manuel Cordova by phone, regarding planned meetings with Minister Jarrin, suggesting that the Bank's submission was also after November 9. Fowler Deposition Ex. 18.

**75.** Docket No. 8 Ex. 24.

**76.** Fowler Deposition Ex. 3.

**77.** Docket No. 29 Ex. 10; Fowler Deposition Ex. 10.

**78.** Fowler Deposition Ex. 8.

After the Bank's submission,[79] Andres Cordova, on behalf of Norsul, addressed a submission to Minister Jarrin "in order to cooperate with the Bank in its complaint" "regarding the form in which the concessionaires [Texaco Ecuador and Gulf Ecuador] liquidated the 2%, for the retention of" the 86% tax.[80]

On March 20, 1974, Texaco Ecuador and Gulf Ecuador transmitted to Minister Jarrin a submission regarding the Bank's complaint.[81] A Gulf Ecuador letter of record posits that the matter now before the Ministry had been previously negotiated privately and became controversial when Norsul and Phoenix aligned themselves with the Bank and Texaco Ecuador and Gulf Ecuador were required to appear before the Ministry, where they were advised "that negotiations would have to be conducted under the supervision of the Ministry, otherwise the controversy would be decided by the Minister." [82]

On June 3, 1974, Minister Jarrin issued Resolution No. 11927.[83] On June 4, a "truly happy" Andres Cordova wrote to Norsul's Fowler, transmitting a copy of 11927 and interpreting its contents to mean:

(1) No reliquidation of the 2% payments for the last two quarters;

(2) Future valuation based on TRV; and

(3) Recognition of the validity of the 2% Payments.[84]

On June 25, 1974, Gulf wrote to Gulf Ecuador, suggesting that a presentation of the need for clarification of 11927 be presented to Minister Jarrin,[85] and on July 9, 1974, Texaco Petroleum wrote to Minister Jarrin, requesting reconsideration of 11927.[86]

In August, 1974, the Government calculated the 2% Payments and Texaco and Gulf objected because the calculation indicated recalculation of that portion of the 2% Payment that would go to Norsul and Phoenix (*i.e.*, 14%), as well as that portion that would be paid as taxes (*i.e.*, 86%).[87] On October 2, 1974, Minister Jarrin responded to Texaco Petroleum Company's July 9 concerns regarding clarification of 11927 (the "1974 Sentencia").[88]

On October 7, Fowler talked to Andres Cordova by phone; his notes indicate that Andres Cordova told him that Minister Jarrin was to be replaced in eight days.[89]

The record indicates that Norsul, Texaco, and Gulf had some negotiations regarding payment between December, 1974 and March, 1975.[90] On March 3, 1975, Gulf transmitted to Norsul a proposed draft agreement of settlement.[91]

On April 14, 1975, Andres Cordova wrote to Minister Salazar, putting into writing an earlier oral presentation, referring to the right of Norsul "to receive the price" from Texaco and Gulf, urging that former Minister Jarrin had mistakenly treated the "price" as income, and referring to the problems created by 11927.[92] On April 22,

**79.** The record indicates that this submission was made after the February, 1974 private negotiations. *See* Docket No. 29 Ex. 10; Docket No. 172 Ex. 22.

**80.** Docket No. 172 Ex. 22.

**81.** Docket No. 172 Ex. 21.

**82.** Docket No. 29 Ex. 10.

**83.** Docket No. 8 Ex. 25; Docket No. 172 Ex. 23; *see* Fowler Deposition Ex. 15.

**84.** Docket No. 237. The happiness appears to have been premature. *See* Fowler Deposition Ex. 19 (letter from Moore, dated March 13, 1975, referring to 11927 as having had "viciously disastrous consequences").

**85.** Docket No. 196 Ex. 12; *see also* Docket No. 196 Ex. 13; Docket No. 196 Ex. 14.

**86.** Docket No. 172 Ex. 25.

**87.** *See* Docket No. 244. This is one of the documents not of record in this case and is ordered to be filed herein.

**88.** Docket No. 8 Ex. 26; Docket No. 172 Ex. 27.

**89.** Fowler Deposition Ex. 16.

**90.** Docket No. 29 Ex. 4; Fowler Deposition Ex. 20; *see* Docket No. 244 (referring to February 22, 1975 letter of Lucas, which is not of record in this case and ordered to be filed herein).

**91.** Docket No. 29 Ex. 7.

**92.** Docket No. 210.

1975,[93] the Minister issued Decree No. 12490, a further "clarification" of 11927 and the 1974 Sentencia (the "1975 Clarification").[94]

## B. POSITIONS OF THE PARTIES

It is clear from the documents of record that the parties to this action believed, and acted on the belief, that actions by the Ecuadorian Government affected the relationship among them. In this lawsuit, their disagreement is with regard to what that effect is.

Defendants argue that 11927 is dispositive of plaintiff's claims under Count I; plaintiff argues that defendants inappropriately attempt to attach *res judicata* effect to 11927, which they characterize as a Minister's "ex parte order." Defendants reply that they do not proffer 11927 as *res judicata*, but only as law of Ecuador that affects plaintiff's rights.

Plaintiff urges further that "[w]hat is at issue in Count I is what the parties intended, in committing themselves to be bound by the prices determined between Texaco/Gulf and the government of Ecuador in computing government royalties"[95] because 11927 is "unconcerned with private disputes"[96] and is a "regulation [that] limited itself to governmental relations."[97] Plaintiff agrees that it is not the validity of 11927 that is at issue, but rather, its meaning.[98]

To the extent that 11927, the 1974 Sentencia and the 1975 Clarification are indicative of Ecuadorian Governmental action affecting the relationship among the parties to the 1965 Private Agreement, defendants argue that:

(1) the TRV is to be used to calculate the 86% tax on the 2% Payment, for all quarters;

(2) the TRV is to be used to calculate the 14% of the 2% Payment only from June 3, 1974; and

(3) the TRV is *not* to be used to calculate the 14% of the 2% Payment for production prior to June 3, 1974.[99]

For the pre–11927 periods not covered by the 1973 Interim Agreement and its extension (*i.e.*, quarters Fourth 1973—Second 1974, plus Third 1974 up until June 3, 1974), defendants contend that they correctly made the 2% Payment on the basis of the West Texas price referred to in the 1961 Concession Contract and adopted by the parties in the 1965 Private Agreement.[100]

## C. EFFECT OF 11927 UNDER ECUADORIAN LAW

Both parties submitted questions to the Ministry and both parties presented oral and written submissions during the proceedings that resulted in 11927. Furthermore, both parties sought clarification or relief from 11927, albeit apparently, from different Ministers of Energy and Natural Resources.

Before the Ministry, plaintiff contended: We are approaching the Ministry in order to cooperate with the Bank in its complaint; as we represent 50% of the remaining 14%, we have the right to ask the Ministry, as Special Judge in all matters pertaining to hydrocarbon contracts, to give its binding interpretation of this problem.[101]

Both parties have submitted expert testimony regarding the legal effect to be given 11927. Defendants' expert Bustamante advises that 11927 is a "Reglamento," with "the full effect of law."[102] Plaintiff's expert Perez advises that ministerial resolutions such as 11927, "may not settle dis-

---

93. *See* Docket No. 8 at ¶ 58.

94. Docket No. 8 Ex. 28.

95. Docket No. 235 at 9.

96. Docket No. 235 at 10.

97. Docket No. 235 at 7; *see also* Docket No. 200 at 17.

98. Docket No. 200 at 19–20.

99. *See, e.g.,* Docket No. 238 at 7.

100. *See* Docket No. 238 at 8, 9–10.

101. Docket No. 172 Ex. 22 at 1.

102. Docket No. 176 at 8.

putes between private parties," but may only "affect the relations between the Ecuadorian state and persons subject to its authority." [103] These positions are not, of course, inconsistent. Like the parties, the experts disagree as to what effect 11927 has on the relationship between the parties.

The Court's review of the written submissions presented to the Ministry by the Bank,[104] the plaintiff,[105] and the defendants;[106] the Resolution itself;[107] and the affidavits of experts Perez[108] and Bustamante,[109] as well as the rest of the record presently before it, suggest the following conclusions relevant to this dispute:

1. The terms of the 1965 Private Agreement were tied to provisions of the 1961 Concession Contract.

2. The provisions of the 1961 Concession Contract relating to this dispute were displaced, as to the relationship between the Government and the concessionaires, by provisions in later-executed concession contracts.

3. The legal validity of the later-executed concession contracts is not contested by the parties hereto.

4. The Ministry had the authority to rule regarding the effect of later-executed concession contracts and Ecuadorian laws on prior-executed contracts.

5. In determining the Bank's complaint with regard to the 86% tax, the Ministry was required to rule on the effect of later-executed concession contracts and the 1971 Hydrocarbons Law (including its 1972 Amendment) on the 1961 Concession Contract.

6. Because the terms of the 1965 Private Agreement were tied to the terms of the 1961 Concession Contract, 11927 affected the rights and obligations of the parties to the 1965 Private Agreement when the Ministry was required, in the process of determining the Bank's complaint, to determine the effect of later-ex-ecuted concession contracts and the 1971 Hydrocarbons Law on the 1961 Concession Contract. At least the Ministry's rulings were binding on the relations between the parties and the Government.

7. The effect of 11927 was to define "net production" for purposes of calculating 2% of said "net production," and thereby derive the amount of the 86% tax.

8. Article 6 of 11927 is not a ruling regarding CEPE's obligation to the plaintiff; rather, it is a clarification of the definition of "net production" for purposes of calculating the 2% of said "net production."

9. Article 3 of the 1974 Sentencia is a clarification of the definition of "net production" for purposes of calculating the 2% of said "net production."

10. I do not presently determine whether the effect of Article 6 of 11927 and Article 3 of the 1974 Sentencia is to bar plaintiff's claims for breach of contract, alleging improper decrease of base production by 25% from the Third Quarter 1974 to date and improper decrease of base production by 37.5% from First Quarter 1977 to date. As to these two claims, defendants' Motion for Partial Summary Judgment is DENIED WITHOUT PREJUDICE to reassert hereafter. In short, the defendants' position is taken under advisement pending trial.

11. The Court reserves ruling on plaintiff's claim for breach of contract, alleging utilization of a low unit value for crude oil production for the Fourth Quarter 1973 through Second Quarter 1974.

## V. CONCLUSION.

Consistent with the foregoing, it is, therefore,

ORDERED AND ADJUDGED that:

---

**103.** Docket No. 203 at 2.

**104.** Docket No. 8 Ex. 24.

**105.** Docket No. 172 Ex. 22.

**106.** Docket No. 172 Ex. 21.

**107.** Docket No. 172 Ex. 23.

**108.** Docket No. 203.

**109.** Docket Nos. 176 and 206.

1. Defendants' motion for summary judgment on the issue of the choice of forum clause is DENIED.

2. The Court reserves ruling on defendants' motion for summary judgment on the issue of breach of contract for reduction of 2% Payments due plaintiff by the amount of CEPE participation (*i.e.,* the 25% Option and the Gulf Withdrawal).

3. The Court reserves ruling on defendants' motion for summary judgment on the issue of breach of contract for use of Low Unit Value for Payments due for Quarters Fourth 1973, First 1974, and Second 1974.

4. Defendants' motion for summary judgment on the issue of the local law applicable to plaintiff's unjust enrichment claim is GRANTED. Ecuadorian local law is applicable.

5. Defendants' motion for summary judgment on the issue of whether Ecuadorian law provides a cause of action for unjust enrichment is DENIED.

6. Defendants' motion for summary judgment on the issue of whether the payments made by CEPE for the 25% Option and the Gulf Withdrawal included any compensation for rights to future production is DENIED.

7. The Court has determined that the following documents referred to in the record should be made a part of the record. Full consideration of the stated issues at trial will be enhanced by the inclusion of these documents. The following documents do not appear in the record of this case at the present time. Therefore, defendants shall, within 20 days of the date of this Order, either (1) file copies of the following documents with the Court, or (2) advise the Court where these documents may be found in the present record or why the documents cannot be filed.

a. The "early 1976" assessment referred to in Docket No. 244.

b. The February 28, 1975, letter, Lucas to Fowler, referred to in Docket No. 244.

c. The August, 1974, assessment referred to in Article 1 of Docket No. 172 Exhibit 23.

d. The Supreme Decree No. 504, referred to in Article 1 of Docket No. 172 Exhibit 23.

e. Interministerial Agreement No. 11925, referred to in Article 1 of Docket No. 172 Exhibit 23.

8. This cause is hereby set for status conference at 10:00 a.m., on Monday, September 15, 1986, at which the parties should be prepared to discuss a trial date and other procedures necessary to ready the case for trial. The parties are reminded of the requirements of Fed. R. Civ. P. 16 and Local Rule 14 with regard to the reports to be filed prior to this status conference.